[No. F019464. Fifth Dist. June 15, 1994.]

KAUFMAN & BROAD CENTRAL VALLEY, INC., Plaintiff and Respondent, v.
CITY OF MODESTO, Defendant and Appellant.

## COUNSEL

Michael D. Milich, City Attorney, and Roland R. Stevens, Assistant City Attorney, for Defendant and Appellant.

Varni, Fraser, Hartwell, Lanferman & Rodgers, David P. Lanferman and Anthony B. Varni for Plaintiff and Respondent.

## OPINION

**BUCKLEY, J.**—The City of Modesto (City) appeals from a judgment granting a petition for writ of mandate filed by Kaufman & Broad Central Valley, Inc. (Kaufman & Broad). The writ ordered the City to refund, with interest, development impact fees it had collected from Kaufman & Broad in excess of those in effect when Kaufman & Broad's vesting tentative subdivision map for its River Terrace subdivision was deemed complete on June 22, 1988.[1]

In this opinion, we hold that the due process notice requirements implicit in the vesting tentative map statutes limit increases in developer's fees to

---

[1]Actually, the vesting tentative subdivision map was filed by Nineveh, Inc., Kaufman & Broad's predecessor-in-interest. It is not disputed that Kaufman & Broad's subsequent

those for which adequate standards for determining the scope and extent of the fee increases are in place at the time the vesting tentative map is deemed complete.

## BACKGROUND

In 1987, the City appointed an "Infrastructure Study Committee" to examine various mechanisms for funding certain future public improvements identified in the City's "Capital Improvement Program." In its final report issued in June of that year, the committee recommended the City establish development impact fees to finance that portion of the improvements made necessary by new development. The committee offered additional recommendations for what it termed "broad based funding" of the remaining unfunded portion attributable to the already existing population. The study identified the following improvements to be supported in whole or in part by impact fees: police buildings and equipment; fire facilities; an expressway loop; street lights; parks and recreation (including a new senior citizens' center); traffic signals; and expansion of city hall. The total estimated cost of these improvements charged to new development was $49,440,000. This cost, in turn, was allocated among different types of development to arrive at an appropriate fee for each. The proposed fee for low-density residential development was $1,413 per unit.[2]

On June 23, 1987, the City enacted Ordinance No. 2520-C.S. implementing most of the Infrastructure Study Committee's recommendations with respect to impact fees. The ordinance, adopted as an urgency measure, added article 9 to chapter 1 of title VIII of the Modesto Municipal Code effective July 1. It authorized imposition of "capital facilities fees" for the purpose of financing new infrastructure "such as parks, roads, traffic signals, police, fire, senior citizen services and city hall expansion" made necessary by a significant increase in new development. Also enacted was section 8-1.904 of the Municipal Code, entitled "ESTABLISHMENT OF FEES," which provided in part: "A Capital Facilities Fee, as established from time to time by the City Council by resolution, shall be due and payable at the earliest time permitted by State law as determined by the Chief Building Official." Finally, on the same date, the City adopted another resolution setting capital facilities fees at $1,417 per unit.[3]

The Infrastructure Study Committee also recommended capital facilities fees be adjusted annually to reflect the increased cost of construction.

---

purchase of the River Terrace subdivision enabled it to succeed to all of Nineveh's rights, including vesting.

[2]Since the only capital facilities fees pertinent to this review are those for low-density residential development, all future references to the fees will apply only to that particular use.

[3]The record provides no explanation for the difference between the committee's recommended fee ($1,413) and the fee adopted by the City ($1,417).

Although it did not incorporate this recommendation into its original fee ordinance, the City adopted Resolution No. 87-1128 in October 1987 in which it found "it is in the best interests of the City of Modesto for capital facilities fees to be adjusted annually in accordance with changes in the Building Cost Index (BCI) published by the Engineering News Record." On this basis, the City increased the fees by 1.23 percent, making the fee $1,434 per unit effective January 1, 1988.

In April 1988, City staff prepared an internal memo entitled "Another Look at the Capital Facilities Fees." The memo concluded the City's capital improvement projects were "woefully underfunded" and recommended the City hire a consultant to consider several options for expanding the scope of the fees.

It was at about this same time that Kaufman & Broad's predecessor, Nineveh, Inc., submitted an application to the City for a vesting tentative subdivision map for a 31-acre residential development known as River Terrace. A contiguous 2.13-acre parcel was designated for future development in what was to become known as River Terrace II. The application was deemed complete on June 22, 1988.[4]

In August 1988, the City issued a request for proposals to develop a new fee schedule. Among the identified objectives of the review were an "[a]djustment of the Capital Facilities Fee to accommodate revised costs for the police building, expressway loop, fire/drill training center, and new assumptions in the role of broad-based funding" as well as "[r]econfiguring the Capital Facilities Fee based on a major shift in assumptions."

In anticipation of a substantial increase in fees, City staff perceived a need "to have the adjusted CFF [capital facilities fee] applicable to any new vesting tentative maps that are accepted for filing from this time forward and to prevent a rush on filing vesting tentative maps which attempt to avoid the adjusted CFF." It therefore recommended the City adopt a policy of attaching the following fee escalator condition to approval of all future vesting tentative maps: " 'The Capital Facilities Fee payable at the time of the issuance of a building permit for any construction in this subdivision map (parcel map) shall be based on the rates in effect at time of issuance of the building permit.' " On August 16, 1988, the City adopted Resolution No. 88-609 implementing this recommendation. The following month, the City

---

[4]As will be discussed more fully, *post*, upon subsequent approval of the map application, Nineveh acquired a vested right, subject to certain limitations, to complete River Terrace in substantial compliance with the ordinances, policies, and standards in effect on June 22, the date the application was deemed complete. (Gov. Code, §§ 66498.1, 66474.2.) Further statutory references are to the Government Code unless otherwise stated.

by resolution increased its capital facilities fees to reflect changes in the building cost index, raising them effective January 1, 1989, to $1,445.70 per unit.

On October 3, 1988, the City planning commission approved Nineveh's vesting tentative map for 134 lots in River Terrace, subject to several conditions including condition 13, the fee escalator condition quoted above.

The City hired Recht Hausrath & Associates to revise its capital facilities fees. The study was to proceed in two stages: the second stage would consider fees related to future transportation needs on the basis of a traffic study then in preparation by another consultant; the first stage would consider all other fee components.

In February 1989, Recht Hausrath issued its initial report (the Phase I Study). It recommended substantial increases in the City's capital facilities fees based upon a much broader approach to future development than had been taken earlier by the Infrastructure Study Committee. In particular, it expanded the area under consideration from certain portions of the City's urban fringe to the entire area expected to be included within the City's future urban boundaries. It also extended the applicable time period from one ending in the year 2000 to one ending at the point of full "buildout" of the urban area in 2011. The need for future improvements increased correspondingly, as did the ratio of new to existing residents and thus the proportionate cost of those improvements chargeable to new development.

The Phase I Study also added two entirely new components to the list of improvements to be funded by impact fees: wastewater treatment and fee administration. Finally, it revised cost estimates for those improvements already on the list.[5] As a result of these various changes, the total estimated cost of improvements attributable to new development grew from $49,440,000 to $165,012,000. This recomputation, in turn, was reflected in a fee increase from $1,445.70 to $2,653.72 per unit adopted by the City in February 1989.[6] The City's resolution approving the increase also provided for periodic review of the fees and reserved the right to revise them further to incorporate additional studies.

[5]Neither in the trial court nor on appeal has the City attempted to apportion or otherwise distinguish the increased fees attributable solely to revised cost estimates from those fees attributable to new components. Upon inquiry by the court at oral argument, the City stated that such a breakdown is not possible, essentially adopting an "all or nothing" approach. Therefore, we need not decide here whether the City would have been able to charge higher fees directly related to the 1987 infrastructure study but caused by unanticipated market forces.

[6]In October 1989, the City adopted a staff proposal to increase capital facilities fees by 1.05 percent to reflect changes in the building cost index. The fees were thereby increased to $2,681.58 per unit effective January 1, 1990.

In May 1989, Nineveh applied to the City for a vesting tentative subdivision map for River Terrace II. The application was deemed complete on June 8 and approved by the planning commission on July 10, subject to the same fee escalator condition imposed on the earlier map at the time it was approved.[7]

In October 1989, Recht Hausrath submitted its report on the second stage of its review of the City's capital facilities fees—those having to do with future improvements to the City's transportation system (the Phase II Study). Once again, Recht Hausrath took a significantly different approach to its examination of future development than had the Infrastructure Study Committee before it. It combined the three transportation components of the original fee (expressway loop, street lights, and traffic signals) with several new street projects into a single broad category for street and intersection improvements. Whereas the Infrastructure Study Committee had projected the aggregate cost of the City's future transportation needs to be $15,296,100, Recht Hausrath adopted a figure of $215 million from the recently completed traffic impact analysis—an amount which represented the anticipated cost to fully mitigate all traffic deficiencies within the City's urban area. The Phase II Study also added two entirely new transportation-related components to the fee structure: public transportation and air quality mitigation. In November 1989, the City approved the Phase II Study and increased capital facilities fees accordingly from $2,653.72 to $4,890 per unit.[8]

In March 1991, Kaufman & Broad acquired River Terrace from Nineveh and thereby succeeded to all rights of the former owners including those conferred by the vesting tentative subdivision maps. In October, Kaufman & Broad began applying for building permits to construct individual units at River Terrace, and was charged capital facilities fees of $4,890 per unit by the City.[9] Kaufman & Broad paid the fees under protest and subsequently brought the present action: a complaint and petition for writ of mandate seeking reimbursement of all fees paid in excess of $1,434, the rate in effect

---

[7]The final map for River Terrace II was approved on June 25, 1991.

[8]In September 1990, Recht Hausrath submitted an additional report to the City recommending it increase capital facilities fees by adding a new component for surface water development. In November, it issued yet another report (the 1990 Update Report) recommending the City further revise the fee schedule to reflect increased costs since 1988 of land acquisition and equipment, and the reduced cost of financing certain improvements. These two recommendations, if fully implemented, would have increased fees from $4,890 to $7,013 per unit. In February of the following year, the City approved the 1990 Update Report and increased its fees to $5,275 per unit (a smaller increase than proposed in the report).

[9]The record fails to disclose why the City did not charge what appears to have been the then existing fee of $5,275 per unit.

when the vesting tentative subdivision map for River Terrace was deemed complete.

The parties agreed some or all of the issues in the action could be decided by the court without a jury on the basis of the pleadings, declarations to be filed, and a statement of agreed facts and accompanying exhibits. Kaufman & Broad thereafter moved for issuance of a peremptory writ of mandate. Following a hearing, the court issued a decision directing a writ to issue "in accordance with [Kaufman & Broad's] Notice of Motion." The City promptly moved to set aside the decision. Following a hearing on the City's motion, the court nevertheless issued a "JUDGMENT GRANTING PEREMPTORY WRIT OF MANDAMUS."

The court based its decision on three grounds. It stated in part:

"(1) . . . At the time respondent CITY determined that the application for this project was complete on or about June 22, 1988, the CITY had no ordinances, policies, or standards in effect requiring payment of 'capital facilities fees' in excess of $1,434.00 per unit (other than possible annual adjustments to reflect changes in the building cost index). Even assuming the CITY had the 'policy' similar to Condition 13, . . . said policy, if given effect, would render these code sections [66498.1 and 66472.2] meaningless and deprive the petitioner of due process.

"(2) . . . At the time of tentative map approval for this project, the respondent CITY did not require capital facilities fees in excess of $1,434.00 per unit. Government Code section 65961 therefore applied to prohibit the respondent CITY from subsequently demanding increased fees. The Court rules that it will take judicial notice of the unpublished District Court of Appeal opinion so that the respondent CITY was collaterally estopped from disputing the application of section 65961 by the Court of Appeal (5th App. District) decision in *Kaufman & Broad* v. *City of Modesto*, filed January 29, 1992, Case No. 15916.[10]

"(3) Respondent CITY's imposition and application of 'Condition No. 13' and by demanding capital facilities fees in excess of $1,434.00 per unit against the project was in violation of Government Code section 65961, section 66472, and petitioner's constitutional rights to due process of law."

The court ordered a peremptory writ of mandate to issue directing the City to return, with interest, capital facilities fees paid by Kaufman & Broad in

[10]Our opinion, *Kaufman & Broad of Northern Cal., Inc.* v. *City of Modesto* (Jan. 28, 1992) F015916, petition for review denied on April 16, 1992, was ordered depublished by the Supreme Court. It is cited in the ensuing discussion where pertinent to the question of collateral estoppel. (Cal. Rules of Court, rule 977(b)(1).)

excess of $1,434 per unit, and further directing the City to refrain from demanding such excess fees for the remaining construction at River Terrace.

## DISCUSSION

This appeal raises two related questions: whether the City was entitled to attach the fee escalator condition to its approval of Kaufman & Broad's vesting tentative map application and, if so, whether the condition permitted imposition of fees in excess of those in effect when the map application was deemed complete. Resolution of these questions, in turn, depends upon the nature and scope of Kaufman & Broad's vested right to proceed with its development of River Terrace.

As these questions involve application of the law to undisputed facts, this court is not bound by the lower court's decision but instead may exercise its independent judgment. (*Halaco Engineering Co.* v. *South Central Coast Regional Com.* (1986) 42 Cal.3d 52, 74-75 [227 Cal.Rptr. 667, 720 P.2d 15].)

### 1. *The Vested Rights Doctrine.*

■ "It has long been the rule in this state and in other jurisdictions that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. [Citations.]" (*Avco Community Developers, Inc.* v. *South Coast Regional Com.* (1976) 17 Cal.3d 785, 791 [132 Cal.Rptr. 386, 553 P.2d 546].) However, this judicially developed doctrine has generally been held to confer a vested right only at the point the property owner has obtained a building permit or other final discretionary approval, notwithstanding its earlier commitment of substantial resources to the project. (*Id.* at pp. 791-798.) Consequently, the Legislature has adopted various measures which confer, at some point earlier in the development process, at least a limited right to proceed with development free from new requirements. The precise scope of this right has yet to be clearly established.

■ In 1982, the Legislature enacted sections 66474.2 and 65961. Section 66474.2, added to the Subdivision Map Act (§ 66410 et seq.), permits a local agency considering a developer's application for a tentative map to apply only those "ordinances, policies, and standards" in effect on the date

the map application was deemed complete.[11] Moreover, this protection effectively extends to the agency's consideration of the final map, which must be approved if it is in substantial compliance with the previously approved tentative map (§ 66474.1; *Youngblood* v. *Board of Supervisors* (1978) 22 Cal.3d 644 [150 Cal.Rptr. 242, 586 P.2d 556]). Section 65961 precludes a local agency, subject to certain limitations, from imposing any condition on a building permit which it could have lawfully imposed on a previously approved tentative map.[12]

The Legislature amended the Subdivision Map Act again in 1984 to add sections 66498.1 through 66498.7, the vesting tentative map statutes. Section 66498.1 permits a developer to file a "vesting tentative map" whenever a tentative map would otherwise be required.[13] Approval of the vesting tentative map entitles the developer, subject to certain limitations, to proceed with the project "in substantial compliance with the ordinances, policies, and standards described in Section 66474.2," that is, those in effect when the map application was deemed complete. (Cf. *Bright Development* v. *City of Tracy* (1993) 20 Cal.App.4th 783, 792-793 [24 Cal.Rptr.2d 618].)

---

[11]In pertinent part, section 66474.2 provides: "(a) Except as otherwise provided in subdivision (b) or (c), in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local agency has determined that the application is complete pursuant to Section 65943 of the Government Code."

[12]Section 65961 provides in pertinent part: "Notwithstanding any other provision of law, upon approval or conditional approval of a tentative map for a subdivision of single- or multiple-family residential units, or upon recordation of a parcel map for such a subdivision for which no tentative map was required, during the five year period following recordation of the final map or parcel map for the subdivision, a city, county, or city and county shall not require as a condition to the issuance of any building permit or equivalent permit for such single- or multiple-family residential units, conformance with or the performance of any conditions that the city or county could have lawfully imposed as a condition to the previously approved tentative or parcel map. Nor shall a city, county, or city and county withhold or refuse to issue a building permit or equivalent permit for failure to conform with or perform any conditions that the city, county, or city and county could have lawfully imposed as a condition to the previously approved tentative or parcel map. . . ."

[13]In pertinent part, section 66498.1 provides: "(a) Whenever a provision of this division requires that a tentative map be filed, a vesting tentative map may instead be filed. [¶] (b) When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in Section 66474.2. . . . [¶] (e) Consistent with subdivision (b), an approved or conditionally approved vesting tentative map shall not limit a local agency from imposing reasonable conditions on subsequent required approvals or permits necessary for the development and authorized by the ordinances, policies, and standards described in subdivision (b)."

### 2. *The Fee Escalator Condition.*

The trial court concluded the City, at the time it approved the vesting tentative subdivision map for River Terrace, "did not require capital facilities fees in excess of $1,434.00 per unit" and was therefore barred by section 65961 from charging the higher fees in effect when it issued building permits for the project. Since the City's approval, in fact, was subject to a fee escalator condition (condition 13) requiring Kaufman & Broad to pay the fees in effect when it obtained the permits, the court's conclusion was evidently based on its additional finding the City had no corresponding fee policy in effect *on the date the map application was deemed complete.* Indeed, the City did not adopt a formal policy of attaching the fee escalator condition to future vesting tentative maps (Res. No. 88-609) until August 16, 1988, almost two months after the map application was deemed complete on June 22. Consequently, Kaufman & Broad contends, as it did below, the City could not properly have imposed the fee escalator condition on the vesting tentative map for River Terrace. The City counters Kaufman & Broad is collaterally estopped by our earlier decision in *Kaufman & Broad of Northern Cal., Inc.* v. *City of Modesto, supra,* F015916 (see fn. 11), to deny the existence of a fee policy—a policy which the City asserts was established not by Resolution No. 88-609 (in 1988) but by Ordinance No. 2520-C.S. (in 1987).

However, we need not decide whether *Kaufman & Broad of Northern Cal., Inc.* v. *City of Modesto* collaterally estops the developer here from arguing against the application of the fee escalator condition to the vesting tentative map, as other reasons preclude the City's charge of new capital facilities fees.

### 3. *The Purpose Behind the Vesting Tentative Map Statutes.*

 The City maintains its attachment of a fee escalator condition to the vesting tentative map for River Terrace entitled it to charge capital facilities fees increased thereafter to reflect *new* assumptions, projects, and cost estimates for future development.[14] We disagree, concluding the City's open-ended fee policy conflicts with the intent of the vesting tentative map statutes.

The purpose underlying the statutes is set out in section 66498.9:

"By the enactment of this article, the Legislature intends to accomplish all of the following objectives:

---

[14]The City would also sanction the imposition of capital facilities fees for any component which bears any relationship to health and safety, regardless of whether the component was contemplated at the time of vesting. Such an approach would effectively eviscerate the vesting tentative map statutes.

"(a) To establish a procedure for the approval of tentative maps that will provide certain statutorily vested rights to a subdivider.

"(b) To ensure that local requirements governing the development of a proposed subdivision are established in accordance with Section 66498.1 when a local agency approves or conditionally approves a vesting tentative map. The private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency, provided the time periods established by this article have not elapsed.

"(c) To ensure that local agencies have maximum discretion, consistent with Section 66498.1, in the imposition of conditions on any approvals occurring subsequent to the approval or conditional approval of the vesting tentative map, so long as that discretion is not exercised in a manner which precludes a subdivider from proceeding with the proposed subdivision."

■ Section 66498.1 et seq. were intended to create a vested right affording greater protection and arising earlier in the development process than the right available under the common law doctrine. (Cal. Subdivision Map Act Practice (Cont.Ed.Bar 1987) §§ 6.28, 6.31, pp. 146-152; Curtin, Cal. Land Use and Planning Law (14th ed. 1994) pp. 187-188.) "The vesting tentative map statute now offers developers a degree of assurance, not previously available, against changes in regulations." (2 Longtin's Cal. Land Use (2d ed. 1987) § 6.50[2], p. 700.) It effectively freezes in place the ordinances, policies, and standards in effect at the time the vesting tentative map application is determined to be complete. (*Bright Development* v. *City of Tracy, supra,* 20 Cal.App.4th at p. 793.)

4. *Due Process.*

The vesting tentative map statutes also incorporate a notice requirement consistent with due process. "The private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency . . . ." (§ 66498.9, subd. (b).) It follows that a developer is entitled to actual or constructive notice of the ordinances, policies, and standards with which it will be expected to comply. (*Bright Development* v. *City of Tracy, supra,* 20 Cal.App.4th at p. 798.) "Quite obviously one cannot rely on what one does not know or cannot reasonably discover." (*Id.* at p. 799.)

A similar purpose appears in other statutes regulating development fees. For example, section 66001 requires a local agency which would impose

such a fee on or after January 1, 1989, to identify the general purpose of the fee and the use to which it will be put (§ 66001, subd. (a)), and to show a "reasonable relationship" between the amount of the fee and the cost of the public improvement it is intended to fund (§ 66001, subd. (b)). (See also, *Ehrlich* v. *City of Culver City* (1993) 15 Cal.App.4th 1737, 1753-1755 [19 Cal.Rptr.2d 468]; *Garrick Development Co.* v. *Hayward Unified School Dist.* (1992) 3 Cal.App.4th 320, 335-336 [4 Cal.Rptr.2d 897].) Among other things, those procedures give developers effective notice of the fees they will be expected to pay.

■ We interpret section 66498.1 to apply this general notice requirement to a local agency seeking to pass along a fee increase imposed after a developer's rights have vested. That is, the ordinances, policies, and standards in effect when the developer's vesting tentative map is deemed complete, must include not only a general fee escalation provision but must also provide reasonable notice of the nature of the fee and the manner of its calculation. A developer about to commit substantial time and resources to a project should be able to predict with at least some degree of assurance what the fee will be when the time comes to pay it.

With this principle in mind, we review the City's fee escalation policy in light of its other ordinances, policies, and standards existing at the time the vesting tentative map application for River Terrace was deemed complete. These were, most notably, Ordinance No. 2520-C.S. and Resolutions Nos. 87-498 and 87-1128.

Ordinance No. 2520-C.S. amended the Modesto Municipal Code to authorize imposition of capital facilities fees, and Resolution No. 87-498, adopted the same day, set the amount of the fees. Both, in turn, incorporated the recommendations made by the Infrastructure Study Committee in its final report. The report laid out in some detail the future improvements to be funded by the fees, their expected costs, and the process by which these costs were allocated to new growth to arrive at the proposed fees for various types of development. Resolution No. 87-1128 provided for annual adjustments to the fees to reflect the increased costs of construction. Thus, although the City's fee policy contemplated future increases in the amount of the fees, it did not foretell the comprehensive reevaluation of the fee structure which the City was later to conduct. In fact, the policy suggested the increases would be limited to relatively modest and predictable cost of building adjustments.

The City argues at some length that Kaufman & Broad had actual or constructive notice of the fee increases later in the development process,

both when the increases were approved and again when it acquired River Terrace. Be that as it may, the critical point in the process for the purposes of the vesting tentative map statutes is the date on which the map application is complete. Consequently, any notice Kaufman & Broad might have received afterward is of no particular significance to the present discussion.

Both parties rely on *Russ Bldg. Partnership* v. *City and County of San Francisco* (1988) 44 Cal.3d 839 [244 Cal.Rptr. 682, 750 P.2d 324] to support their respective positions. In *Russ*, the plaintiffs were granted building permits for new office buildings conditioned upon their participation in a " 'downtown assessment district, *or similar fair and appropriate mechanism,* to provide funds for maintaining and augmenting transportation service, should such a mechanism be established by the City.' " (At p. 844, italics added.) Almost two years later, while the buildings were under construction, the city enacted an ordinance requiring developers of downtown buildings, including the plaintiffs, to pay a "Transit Impact Development Fee" (TDIF) to offset the anticipated costs to the public transit system of increased ridership generated by new office space. (*Id.* at pp. 844-845.) The question before the Supreme Court was whether the transportation funding condition gave the plaintiffs adequate notice of the actual funding mechanism eventually adopted by the city. (*Id.* at pp. 843, 845.) After comparing the characteristics of impact fees and assessment districts, the court found the two were sufficiently similar that the TDIF came within the contemplation of the funding condition. Therefore, the court held imposition of the fee did not impair the plaintiffs' vested rights. (*Id.* at pp. 847-853.)

Initially it should be noted *Russ* was decided on due process grounds within the framework of the common law vested rights doctrine. It therefore provides only limited guidance with respect to the application of the arguably broader vested rights created by statute. More significantly, the situation in *Russ* was qualitatively different than the one involved here. The City did not seek simply to increase its existing fees according to an established formula, but rather to create entirely new fees by adding additional categories of improvements to be funded by the fees, by adding new projects within the existing categories, and by recomputing the fees according to new assumptions about future growth. Thus, while the plaintiffs in *Russ* were put on notice they would be held responsible for contributing to an assessment district or some "similar" funding mechanism, Kaufman & Broad had no notice it would be responsible for capital facilities fees beyond those incorporated in the original fee structure.

This case shares more in common with *Bright Development* v. *City of Tracy, supra,* 20 Cal.App.4th 783, the one decision as yet to apply the

vesting tentative map statutes. In *Bright*, the city approved the developer's vesting tentative subdivision map subject to a condition the developer "underground" utilities at its own expense. This condition was consistent with a written city policy in effect when the vesting tentative map application for the project was deemed complete. Approximately 19 months later, the city amended the written policy to "clarify and memorialize" what it claimed was its long-standing but unwritten policy of requiring developers to underground existing *off-site* utilities. When the city sought to apply the amended policy to the subdivision, the developer invoked its vested rights, claiming there was no policy applying to off-site utilities in effect when its map application was deemed complete or, alternatively, that it had not been given adequate notice of any such policy. (*Id.* at pp. 789-790.) The appellate court agreed. (*Id.* at p. 800.) It found that none of the sources cited by the city for its policy referred to off-site utilities, and therefore there was no evidence the unwritten policy existed anywhere but in the minds of the city employees charged with enforcing it. (*Id.* at pp. 796-797.)

Likewise, in this case the City had no policy of charging capital facilities fees for anything other than the specific improvements identified by the Infrastructure Study Committee. Further, it had no policy of increasing the fees for any reason other than to adjust for increases in the cost of construction.[15] Therefore, we conclude section 66498.1 conferred on Kaufman & Broad the vested right to develop its River Terrace subdivision subject only to the capital facilities fees in effect when its vesting tentative map application was deemed complete ($1,434), adjusted annually according to the building cost index to reflect increases in the costs of construction.

### River Terrace II

The City separately argues that because the vesting tentative map for River Terrace II was not even filed until June 8, 1989, the City should "prevail on that issue with respect to the 14 lots in the River Terrace II subdivision." This is essentially the extent of the City's argument in this regard. Kaufman & Broad does not substantively or separately address the River Terrace II issue.[16]

The City's capital facilities fees in effect on June 8, 1989, were $2,653.72, having recently been increased to reflect recommendations in the Phase I

---

[15]Kaufman & Broad acknowledges the City had a preexisting policy of adjusting capital facilities fees annually according to changes in the building cost index.

[16]Kaufman & Broad argues the City failed to draw any distinction at trial between River Terrace and River Terrace II and thereby waived any argument it might make on appeal that the two subdivisions should be treated differently with respect to the applicable fee. However, we do not construe the City's primary argument below—that its fee escalation policy applied equally to both projects—as a concession they are the same for all purposes. Moreover,

Study by Recht Hausrath (Res. No. 89-373). The same resolution included the following language under the heading "SUBSEQUENT ANALYSIS OF FEE":

"The fee established herein is adopted and implemented by the Council and [*sic*] reliance on the comprehensive report that has been prepared for the City by Recht Hausrath and Associates. The City will continue to conduct further studies and analysis to determine whether the fee should be revised. When additional information is available, the City Council shall review this fee to determine that the fee amounts are reasonably related to the impact of future development in the City of Modesto. The City Council may revise the fee to incorporate the findings and conclusions of further studies and any standards in the City's revised General Plan."

We perceive nothing in this language which provides any discernible standard which serves either to define or limit the scope of future increases. It therefore does nothing to overcome the deficiencies already noted in the City's general fee escalation policy. Accordingly, we conclude capital facilities fees for housing units within River Terrace II are limited to those in effect when the vesting tentative map was deemed complete, plus subsequent increases adopted to reflect changes in the building cost index.

### DISPOSITION

The judgment is reversed and the case is remanded to the superior court with direction to the court to modify its judgment to order the City to refund fees for individual units within River Terrace and River Terrace II in excess of those in effect when the vesting tentative maps for their respective subdivisions were deemed complete, plus increases subsequently approved to reflect changes in the building cost index. In all other respects, the judgment is affirmed. Costs are awarded to respondent.

Thaxter, Acting P. J., and Franson, J.,* concurred.

Appellant's petition for review by the Supreme Court was denied September 8, 1994.

---

where, as here, the contested question is one of law determinable from uncontroverted facts, we may address it. (*Redevelopment Agency v. City of Berkeley* (1978) 80 Cal.App.3d 158, 167 [143 Cal.Rptr. 633].)

*Retired Presiding Justice of the Court of Appeal, Fifth District, sitting under assignment by the Chairperson of the Judicial Council.