[No. F054785. Fifth Dist. Jan. 30, 2009.]

BUILDING INDUSTRY ASSOCIATION OF CENTRAL CALIFORNIA et al., Plaintiffs and Appellants, v. CITY OF PATTERSON, Defendant and Respondent.

COUNSEL

Sheppard Mullin Richter & Hampton, David P. Lanferman and Margaret J. Pak for Plaintiffs and Appellants.

Law Office of George G. Logan and George G. Logan for Defendant and Respondent.

OPINION

DAWSON, J.—Morrison Homes, Inc. (Developer), obtained a development agreement and tentative subdivision maps for the construction of two residential subdivisions in Patterson, California. At the time those documents were approved, the City of Patterson (City)[1] allowed developers to pay a fee of $734 per house in lieu of building affordable housing. About three years later, City increased this fee to $20,946 per house and sought to apply the increased fee to Developer's two residential projects among others.

---

[1] For purposes of this opinion, the term "City" refers to the governmental entity and the term "Patterson" refers to the geographical area governed by that entity.

Developer sued City claiming that the increased fee violated (1) its vested property rights, (2) its contractual rights under the development agreement, (3) various statutory provisions, and (4) constitutional provisions requiring voter approval of special taxes. The trial court found that the increased in-lieu fee was permitted under section 4.5(d)(ii) of the development agreement and the amount of the increase was reasonably justified. The court entered judgment accordingly, and Developer appealed.[2]

We will conclude that the meaning of the contractual term "reasonably justified" presents a question of law and that, under an objective test, the term is meant to incorporate the legal standards generally applied to such fees. Those legal standards require that the amount of a development fee be limited to the cost of that portion of a public program attributable to the development. City has failed to show that the increase in its in-lieu fee satisfies this standard and, therefore, has failed to show that the increase was "reasonably justified" as required by the development agreement.

The judgment is reversed and the matter remanded for further proceedings.

### FACTS

*Development Project*

Developer owns two residential subdivisions, known as Magnolia and Bella Flora and consisting of 214 single-family residential lots. The subdivisions are part of a larger development known as Patterson Gardens, which contains 305.3 acres that are divided into seven different areas or phases. Plans for Patterson Gardens include five areas of low density residential housing that cover 228.5 acres and contain a total of 985 dwelling units.

City conducted environmental and land use review in connection with its approval of the proposed development of Patterson Gardens. Also, pursuant to Government Code section 65864 et seq., City entered into a development agreement with Developer's predecessor-in-interest, dated January 21, 2003 (Development Agreement). That agreement provides for the development of Patterson Gardens and establishes certain development rights in that project.

The city council approved the Development Agreement in January 2003, and that approval became ordinance No. 648.

Section 5.1 of the Development Agreement states that, except as the agreement provides otherwise, the developer shall pay only those fees in

---

[2] Developer is joined in the appeal by the Building Industry Association of Central California, a California nonprofit corporation with members that own property within Patterson and are affected by the in-lieu fee.

effect prior to the effective date of the Development Agreement and specifically listed in exhibits D-1 (residential development) and D-2 (retail/office development). Those exhibits list certain capital facility fees, connection fees, and use fees. Exhibit D-1 lists over 20 fees, including an affordable housing in-lieu fee of $734 per unit. Exhibit D-1 also states that the affordable housing in-lieu fee is referenced in section 4.5 of the Development Agreement.

Section 4.5 of the Development Agreement addresses how the parties will satisfy City's affordable housing objectives. The developer has four alternatives: (1) build affordable housing units; (2) develop senior housing within the project; (3) obtain a sufficient number of affordable residential unit credits from other residential developments within City; or (4) pay an in-lieu fee at the time the building permit is issued for a market rate housing unit.

Section 4.5(d)(ii) of the Development Agreement, which is central to the contractual issues, provides in full: "Developer shall pay an in-lieu fee in an as-yet undetermined amount per EDU [equivalent dwelling unit] for moderate-income housing and an as-yet undetermined amount per EDU for low and/or very low-income housing, but in no event less than the current fee of $734.00 per EDU. Developer acknowledges that the City is currently preparing an updated analysis of its Affordable Housing fee and hereby agrees to be bound by the revised fee schedule, including indexing as provided by ordinance at the time of adoption of the fee, providing the same is reasonably justified. Said fee shall be paid at the time a building permit is issued for each Non-Affordable Unit."

The city council also adopted resolution No. 2003-05 in January 2003. The resolution approved "the combined preliminary/final development plan and vesting tentative subdivision map for the Patterson Gardens project . . . subject to the conditions set forth in Exhibit E hereto." Condition No. 1 provided: "Development of Patterson Gardens shall be in accordance with the approved Final Development Plan, as modified by these conditions and as may be modified by a development agreement between the City and developer." Condition No. 1 also stated that "the terms of the development agreement will control" in the event of a conflict with the conditions.

*In-lieu Fee*

City first adopted an "affordable housing in-lieu fee" in 1995. The fee originally was set at $319 per new single-family home, payable as a condition to the issuance of a building permit for such construction.

In May 2001, City received a study prepared by its consulting firm, Crawford Multari & Clark Associates, which addressed certain fees and recommended raising the affordable housing in-lieu fee. That study reviewed four different approaches to calculating the affordable housing in-lieu fee. One approach, the "leverage" analysis, considered the cost of providing an affordable single-family house and assumed federal or state funding would require the local government to provide only 9 percent of the total amount needed. It produced a fee of $734 per unit.

In July 2001, the city council adopted resolution No. 2001-53, which increased the affordable housing in-lieu fee to $734 per new single-family home.

In November 2005, the city council adopted resolution No. 2005-114, which adjusted the fees allowed under certain development agreements, including the agreement for Patterson Gardens. The resolution stated that the fees assessed under the development agreements could be adjusted periodically to reflect increases in the current construction cost index.[3] The resolution also stated that the index had experienced larger than normal increases and these increases warranted an adjustment to the fees allowed under the development agreements. The resolution adjusted certain fees, but not the affordable housing in-lieu fee.

A declaration of David Moran[4] states that, by 2003, City's strategies for supplying affordable housing were falling short. He further states that in 2003 City investigated ways to improve the supply of affordable housing, including revisions to the development impact fee. An outcome of the investigation was a "Development Impact Fee Justification Study 2005/06 Update" prepared for City by Crawford Multari & Clark Associates (Fee Justification Study). Moran is listed as one of the authors of this study.

The Fee Justification Study recommended increasing the affordable housing in-lieu fee up to $20,946 per market rate unit. This recommendation did not rely on the prior assumption (part of the "leverage" approach to calculat-

---

[3] Section 5.2 of the Development Agreement gives City the right to increase the fees set forth in exhibits D-1 and D-2 but prohibits any increase in excess of the increase in a construction cost index.

[4] Moran is a senior associate with Crawford Multari & Clark Associates, a planning and consulting firm. Moran was assigned as the principal planning consultant for City before 2000. His June 2007 declaration states that he is very familiar with the planning activities of City, including the calculation, imposition, and collection of development impact fees.

ing the fee) that the local fee could be used as leverage to obtain federal grants and loans. Instead, the recommendation was based on bridging the so-called "affordability gap" between the cost of a new market rate unit[5] and the cost of units affordable to very low, low, and moderate income households. The affordability gap analysis compared the cost of units to an estimate of what the three different income levels could afford. The difference was an estimate of the subsidy someone of that income level would need to be able to obtain housing. The analysis estimated a subsidy of $55,280 was needed for each unit of moderate income housing, a subsidy of $119,280 was needed for each unit of low income housing, and a subsidy of $167,280 was needed for each unit of very low income housing.

The next step in the calculation involved multiplying the amount of the subsidy for each income level by the number of units needed for that income category. When the three products of this multiplication were added together, the sum was the total amount of the subsidy needed for affordable housing. The Fee Justification Study identified the number of units needed for each income level by referring to addendum No. 1 to the 2001–2002 Regional Housing Needs Assessment for Stanislaus County prepared by the Stanislaus Council of Governments.[6] That document allocated 642 units of affordable housing to Patterson, consisting of 235 units of very low income, 182 units of low income, and 225 units of moderate income housing.[7]

The Fee Justification Study treated the allocation as establishing City's need for affordable housing at 642 units. The prior approach had defined the need for affordable housing by assuming that 5 percent of all new dwellings in a project should be affordable to low or very low income households and that another 5 percent should be affordable to moderate income households.

The estimates of the subsidy required per unit of affordable housing multiplied by the number of units needed for each income level produced a total subsidy of $73.5 million. The study spread this total subsidy over the 3,507 unentitled units in Patterson as of January 2005.[8] The result was the per unit fee of $20,946.

---

[5] The median price of a market rate single-family dwelling in Patterson was $157,000 in 2001 and $247,280 in 2004.

[6] Patterson is located within Stanislaus County.

[7] The Fee Justification Study described the 642-unit figure as City's "Regional Housing Needs Assessment target."

[8] The Fee Justification Study states that data available from City's Department of Finance suggest that about 5,940 dwelling units remained to be constructed in City's general plan area and 2,433 of those units previously have been entitled. This leaves an estimate of 3,507 units unentitled.

We note that if the 214 units in Developer's two subdivisions had been the only unentitled units in Patterson as of January 2005, this approach would have yielded a per unit affordable housing fee of $343,458 ($73.5 million/214 units).

In March 2006, the city council relied on the Fee Justification Study and adopted resolution No. 2006-19, which set the affordable housing in-lieu fee at $20,946 per new single-family home.

## PROCEEDINGS

In October 2006, Developer filed a complaint and writ petition challenging City's imposition of the $20,946 per unit exaction as well as City's characterization that it was an increase in the affordable housing in-lieu fee.

After an initial hearing in May 2007, the trial court allowed the parties to submit additional evidence. City submitted the declaration of Moran discussed above. (See fn. 4, *ante*.) Developer objected to the declaration on a number of grounds, all of which the trial court later overruled.

After another hearing, in August 2007, the trial court reopened the case and directed the parties to provide a stipulation that attached a copy of the Regional Housing Needs Assessment for Stanislaus County prepared by the Stanislaus Council of Governments during 2001 and 2002 and adopted in October 2002. The parties submitted the stipulation in October 2007.

The trial court issued its written decision on December 20, 2007. The court denied Developer's petition for writ of mandate, found for City on all causes of action, and overruled all objections. The court found that "the methodology used by [City] in determining the amount of the affordable housing fee at issue is reasonable [and] . . . the absolute amount of the per-lot fee here is clearly reasonable compared to that charged in other localities, using the comparisons the parties agreed the Court could consider."[9]

## DISCUSSION

### I. *Standards of Review*[*]

· · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · · ·

### II. *Vested Rights Claim*

Developer contends that the $20,946 fee violates its rights under the vesting tentative map and under Government Code section 65961.

---

[9] During oral argument, counsel indicated that the comparisons referenced were set forth in a table on page 7 of Moran's declaration. Because Developer objected to the admissibility of Moran's declaration, it does not appear from the record that the parties agreed the trial court could consider the comparisons. In this appeal, we do not reach Developer's argument that the trial court erred by admitting Moran's declaration and thus need not address whether the trial court's consideration of the comparisons was error.

[*] See footnote, *ante*, page 886.

■ We recognize that vested rights protection extends to a property owner who has obtained a vesting tentative map. (*Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309, 322, fn. 3 [82 Cal.Rptr.2d 649].) We conclude, nonetheless, as discussed below, that in the circumstance presented by this appeal Developer's contention about vested rights does not require a separate analysis.

### A. Rights Vested by Vesting Tentative Map

City's approval of the vesting tentative map[10] was subject to conditions, and those conditions explicitly state that, in the event of a conflict between the Development Agreement and the vesting tentative map, the terms of the Development Agreement shall control. Therefore, if the increased fee is authorized by the Development Agreement, it will not offend the rights established by the approval of the vesting tentative map. In other words, the right that vested when the map was approved was the right to have any increase in the affordable housing in-lieu fee comply with the terms of the Development Agreement.[11]

Consequently, the critical question in this appeal is whether the increased fee complied with the terms of the Development Agreement. If it did, then the increase will not violate any right vested under the vesting tentative map.

### B. Government Code Section 65961*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### III. Violation of the Terms of the Development Agreement

### A. Contractual Language in Dispute

The Development Agreement clearly stated that (1) the amount of the affordable housing in-lieu fee was "as-yet undetermined" when the agreement was made, and that (2) the new amount would "in no event [be] less than"

---

[10] The terms "tentative map" and "vesting tentative map" are defined in Government Code section 66424.5.

[11] The fact that the tentative vesting map in this case is subject to the terms of the Development Agreement distinguishes this case from *Kaufman & Broad Central Valley, Inc. v. City of Modesto* (1994) 25 Cal.App.4th 1577 [30 Cal.Rptr.2d 904]. That case did not mention the existence of a development agreement, much less a development agreement that modified the vesting tentative map and addressed the fee being disputed.

*See footnote, *ante*, page 886.

$734 per unit. Whether the $20,946 fee subsequently imposed by City violated the Development Agreement centers on the meaning of the following sentence from section 4.5(d)(ii): "Developer acknowledges that the City is currently preparing an updated analysis of its Affordable Housing fee and hereby agrees to be bound by the revised fee schedule, including indexing as provided by ordinance at the time of adoption of the fee, providing the same is *reasonably justified.*" (Italics added.)

## B. *Meaning of Developer's Acknowledgement*

Developer contends its acknowledgement of the preparation of an updated analysis should not be interpreted to mean that City was allowed to change the method of analysis upon which it based the affordable housing fee. In Developer's view, City was allowed only to update that method of analysis and, thus, was bound to continue to use the leverage approach when calculating revisions to the affordable housing fee.

We conclude that the language in section 4.5(d)(ii) of the Development Agreement cannot be interpreted as compelling City to use a particular methodology when calculating revisions to the in-lieu fee. The reference to an "updated analysis" is not accompanied by language indicating it is a binding requirement or condition imposed on City. Instead, it is stated merely as an acknowledgement by Developer. In contrast, when the parties intended to impose a requirement or condition on the revised fee, they expressed this intent clearly. Specifically, Developer agreed to be bound by the revised fee provided it was reasonably justified. Accordingly, we reject the view that the Development Agreement required City to use the leverage approach when calculating the revised fee.

## C. *Meaning of "Reasonably Justified"*

The parties dispute what the phrase "reasonably justified" means. City contends this standard effectively waived any legal requirements that otherwise might have applied to the fee increase. In contrast, Developer contends the standard incorporated the legal requirements applicable to the fee increase. (See 1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, § 752, pp. 842–843, and cases cited therein [generally, existing legal standards are implied by law into a contract].) Developer contends, in other words, that the terms cannot be interpreted as its consenting to an increase that did not conform to otherwise applicable law.

To resolve this dispute over the meaning of the Development Agreement, we assume that the ordinary rules of contract interpretation apply. No party has argued otherwise.

■ "California courts have long recognized that the interpretation of a written instrument is a judicial function unless the interpretation turns upon the credibility of extrinsic evidence [citation] . . . ." (*The Lundin/Weber Co. v. Brea Oil Co., Inc.* (2004) 117 Cal.App.4th 427, 433 [11 Cal.Rptr.3d 768].) In this case, the parties presented no conflicting extrinsic evidence regarding what was intended by the term "reasonably justified" at the time of contracting. Consequently, we conclude the meaning of the term "reasonably justified" presents a question of law subject to independent review on appeal. (*Smith v. Selma Community Hospital* (2008) 164 Cal.App.4th 1478, 1502 [80 Cal.Rptr.3d 745] [interpretation of a writing is a question of law where credibility of extrinsic evidence is not an issue].)

■ A court's determination of the meaning of a contract is designed "to give effect to the mutual intention of the parties as it existed at the time of contracting . . . ." (Civ. Code, § 1636.) When contractual language is clear and explicit, it governs. (*Id.,* § 1638.) Alternatively, where uncertainty or ambiguity exists, the language "must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (*Id.,* § 1649.) This rule is designed to protect the objectively reasonable expectations of the promisee. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545]; see generally Wonnell, *Expectation, Reliance, and the Two Contractual Wrongs* (2001) 38 San Diego L.Rev. 53.)

Here, we conclude that an objectively reasonable person would expect the term "reasonably justified" to mean that any increase in the affordable housing in-lieu fee would conform to existing law. In other words, part of the way one would show a fee is reasonably justified is to show that it does not violate established legal principles. The contrary interpretation, which would conclude that the term did away with applicable legal requirements, would create much greater change in the relationship between the parties. An objectively reasonable person would expect more explicit language to implement such a change. Thus, it is too great a leap to infer that the term "reasonably justified" demonstrates an intention to waive applicable legal requirements.

Based on this interpretation, we next consider what legal requirements were incorporated into the Development Agreement.

D. *Applicable Legal Requirements*

In *San Remo Hotel v. City and County of San Francisco* (2002) 27 Cal.4th 643, 663–664 [117 Cal.Rptr.2d 269, 41 P.3d 87] (*San Remo*), owners of a hotel sued to invalidate a San Francisco ordinance limiting the conversion of residential hotel rooms (usually occupied by low-income tenants) to tourist hotel rooms. The purpose of the ordinance was to preserve the availability of residential hotel rooms for the city's low-income residents who, otherwise, would have had no viable housing options. To achieve that goal, the ordinance required a hotel converting a residential hotel unit into a tourist unit to replace the residential unit elsewhere, pay a fee in lieu of providing the replacement unit, or take other action that would further replacement. Pursuant to the ordinance, the city issued the hotel owners a conditional use permit authorizing the conversion of hotel rooms only upon compliance with one of those alternatives.

 The hotel owners filed suit, alleging the ordinance was unconstitutional because it violated the state takings clause. They argued that *Nollan/Dolan/Ehrlich*[12] scrutiny applied to the court's review of the replacement in-lieu fee. The *Nollan/Dolan/Ehrlich* heightened level of constitutional scrutiny inquires whether an "essential nexus" and "rough proportionality" are shown between an ad hoc exaction, imposed as a condition of development, and the impact of that development. (*San Remo, supra,* 27 Cal.4th at pp. 665–667, 671.) The *San Remo* court refused to apply this heightened level of scrutiny to the San Francisco ordinance, stating: "Nor are plaintiffs correct that, without *Nollan/Dolan/Ehrlich* scrutiny, legislatively imposed development mitigation fees are subject to no meaningful means-ends review. As a matter of both statutory and constitutional law, such fees must bear a reasonable relationship, in both intended use and amount, to the deleterious public impact of the development. (Gov. Code, § 66001; *Ehrlich, supra,* 12 Cal.4th at pp. 865, 867 (plur. opn. of Arabian, J.); *id.* at p. 897 (conc. opn. of Mosk, J.); *Associated Home Builders etc., Inc. v. City of Walnut Creek* (1971) 4 Cal.3d 633, 640 [94 Cal.Rptr. 630, 484 P.2d 606].) . . . While the relationship between means and ends need not be so close or so thoroughly established for legislatively imposed fees as for ad hoc fees subject to *Ehrlich,* the arbitrary and extortionate use of purported mitigation fees, even where legislatively mandated, will not pass constitutional muster." (*San Remo, supra,* 27 Cal.4th at p. 671.)[13]

---

[12] *Dolan v. City of Tigard* (1994) 512 U.S. 374, 391 [129 L.Ed.2d 304, 114 S.Ct. 2309]; *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825, 837 [97 L.Ed.2d 677, 107 S.Ct. 3141]; *Ehrlich v. City of Culver City* (1996) 12 Cal.4th 854 [50 Cal.Rptr.2d 242, 911 P.2d 429].

[13] The statutory provision referenced in this quote states its test this way: "In any action imposing a fee as a condition of approval of a development project by a local agency, the local agency shall determine how there is a reasonable relationship between the amount of the fee and the cost of the public facility or portion of the public facility attributable to the development on which the fee is imposed." (Gov. Code, § 66001, subd. (b).) We note that

Similarly, the court in *Action Apartment Assn. v. City of Santa Monica* (2008) 166 Cal.App.4th 456 [82 Cal.Rptr.3d 722], refused to apply the *Nollan/Dolan/Ehrlich* test when analyzing the facial validity of an ordinance of general application that required construction of affordable multifamily housing as a condition to development of multifamily ownership projects. (*Action Apartment Assn. v. City of Santa Monica*, at pp. 469–471.)[14]

Upon examination, it appears that the affordable housing in-lieu fee challenged here is not substantively different from the replacement in-lieu fee considered in *San Remo*. Both are formulaic, legislatively mandated fees imposed as conditions to developing property, not discretionary ad hoc exactions. (*San Remo, supra*, 27 Cal.4th at p. 671.) We conclude, for this reason, that the level of constitutional scrutiny applied by the court in *San Remo* must be applied to City's affordable housing in-lieu fee and is one of the legal requirements incorporated into the Development Agreement.

Accordingly, we conclude that the increase in the fee is not "reasonably justified" as required by the Development Agreement unless there is a reasonable relationship between the amount of the fee, as increased, and "the deleterious public impact of the development." (*San Remo, supra*, 27 Cal.4th at p. 671.)

City, we note, argues for no different test. Instead, without being more specific or explaining the point in any way, City merely states that the Fee Justification Study "clearly shows the need for affordable housing generated by the new construction." Despite the lack of an argument from City addressed to the reasonable relationship test, we have examined the cited Fee Justification Study in detail, as well as Moran's declaration and other documents, to determine whether the test is satisfied by the information

---

section 66001 expressly applies to fees imposed to mitigate the effects of development on "public facilit[ies]." We express no opinion on the question whether section 66001, or the Mitigation Fee Act in general (see Gov. Code, § 66000.5), applies to affordable housing in-lieu fees.

[14] We note that the court in *Home Builders Assn. v. City of Napa* (2001) 90 Cal.App.4th 188 [108 Cal.Rptr.2d 60] considered a takings clause challenge to the facial validity of an inclusionary zoning ordinance and upheld its validity. In this appeal, Developer has attempted to distinguish *Home Builders* by arguing that case did not involve a development agreement, vested rights or judicial review in an "as applied" context. Because Developer has not argued that the affordable housing in-lieu fee is facially invalid, we do not decide the question of facial invalidity here. We also note that *Home Builders* was decided about nine months before the California Supreme Court decided *San Remo*.

provided. In the process, we have located nothing that demonstrates or implies the increased fee was reasonably related to the need for affordable housing associated with the project.

■ The record in this matter reveals no reasonable relationship between the extent of City's affordable housing need and development of either (1) the 214 residential lots that constitute the two subdivisions owned by Developer or (2) the 3,507 unentitled lots identified in the Fee Justification Study. Instead, the Fee Justification Study reveals that the in-lieu fee of $20,946 per market rate unit was calculated based on an allocation to City of 642 affordable housing units, out of the total regional need for affordable housing identified in the 2001–2002 Regional Housing Needs Assessment for Stanislaus County. No connection is shown, by the Fee Justification Study or by anything else in the record, between this 642-unit figure and the need for affordable housing associated with new market rate development. Accordingly, the fee calculations described in the Fee Justification Study and Moran's declaration do not support a finding that the fees to be borne by Developer's project bore any reasonable relationship to any deleterious impact associated with the project.

For this reason, we are persuaded that the increased fee of $20,946 violated section 4.5(d)(ii) of the Development Agreement because it was not "reasonably justified" within the meaning of that provision.[15]

IV. *Remedy*

The appellate briefing did not address the appropriate remedy in this case. During oral argument, counsel for Developer contended that there were three possible remedies this court could direct the trial court to implement. Because the bases relevant to choosing among these and other remedies have not been developed before this court, we conclude the superior court should decide the issue of the appropriate remedy in the first instance.

---

[15] The record in this case appears fully developed as to the reasoning process City used when increasing the fee. Thus, this is not a case where the question whether the increase was "reasonably justified" was resolved based on the sufficiency of the proof. In other words, the actual reasoning process City used does not satisfy the contractual standard set by the parties.

## DISPOSITION

The judgment is reversed and the matter is remanded to the trial court for further proceedings. The trial court is directed to (1) vacate its decision of December 20, 2007, (2) enter a new decision that invalidates the $20,946 per unit fee because it violates the terms of the Development Agreement and (3) determine the remedy after conducting any proceedings it deems necessary or appropriate.[16] Costs on appeal are awarded to appellants.

Vartabedian, Acting P. J., and Cornell, J., concurred.

A petition for a rehearing was denied March 20, 2009, and on March 2, 2009, and March 20, 2009, the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied June 17, 2009, S171536. Werdegar, J., did not participate therein.

---

[16] These directions should not be interpreted to preclude the parties from agreeing on the appropriate remedy and presenting that agreement to the trial court for approval.