Filed 12/2/21  Chinatown Community etc. v. City of L.A. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHINATOWN COMMUNITY FOR EQUITABLE DEVELOPMENT,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CITY OF LOS ANGELES et al,<br><br>  Defendants and Respondents,<br><br>ATLAS CAPITAL GROUP, LLC,<br><br>  Real Party in Interest and Respondent. | B307157<br><br>(Los Angeles County Super. Ct. No. 19STCP01710) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mitchell L. Beckloff, Judge.  Affirmed.

Mitchell M. Tsai for Plaintiff and Appellant.

Remy Moose Manley, Sabrina V. Teller, Nathan O. George; Michael N. Feuer, City Attorney, Terry Kaufmann Macias, Assistant City Attorney, John F. Fox, Liliana M. Rodriguez, Deputy City Attorneys; DLA Piper, A. Catherine Norian, Kyndra Joy Casper, Andrew J. Brady and Karen L. Hallock for Defendants and Respondents and Real Party in Interest and Respondent.

* * * * * *

Chinatown Community for Equitable Development (CCED) appeals from a trial court judgment denying its petition for writ of mandate and complaint for declaratory relief (petition). CCED filed the petition following the decision by respondents City of Los Angeles, Los Angeles City Council, and Los Angeles Department of City Planning (collectively city) to approve a 725-unit, mixed-use development (the project) proposed by real party in interest and respondent Atlas Capital Group, LLC (Atlas).

CCED claims that the trial court misinterpreted the law in rendering its decision that Measure JJJ, a voter-approved initiative, did not apply to the project because Atlas's map application was deemed complete six months prior to Measure JJJ's effective date.[1]

CCED further challenges the trial court's determination that substantial evidence supported respondents' compliance

_____

[1]     On November 8, 2016, the Los Angeles voters approved initiative ordinance JJJ, the Affordable Housing and Labor Standards Related to City Planning initiative (Measure JJJ), now codified in the Los Angeles Municipal Code (LAMC).

2

with the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.) (CEQA). Specifically CCED claims that substantial evidence does not support the conclusion contained in the environmental impact report (EIR) that no significant hazards exist. CCED claims that evidence of project site remediation and cleanup of soil contamination on the site occurring prior to 2003 does not support the current conclusion of no significant hazards due to certain modifications of the project since it was initially proposed.

Finally, CCED claims the city was required to recirculate the EIR based on significant new information and revisions in the final EIR, including revisions to the methane mitigation plan and removal of the project's designation as a project required to comply with footnote 12 of the Central City North Community Plan (Footnote 12).[2]

We find that under the applicable Government Code sections governing the approval process and the vesting of a developer's rights, Measure JJJ is not applicable to the project. We further find that CCED failed to meet its burden of showing that there was insufficient evidence to support the less than significant hazards finding and the decision not to recirculate the EIR. Therefore, we affirm the judgment.

---

[2] Footnote 12 of the Central City North Community Plan required 20 percent of the project to be set aside for affordable housing. Although the city initially indicated that Footnote 12 was applicable to the project, that position was later changed because the city never formally adopted Footnote 12.

## FACTUAL BACKGROUND

**The project and original application**

On August 1, 2012, Atlas's predecessor-in-interest applied to develop the project on a 4.92-acre vacant site located directly across the street from the Chinatown Gold Line Metro Station (the site).

The city deemed Atlas's predecessor's application complete on December 7, 2012. On June 17, 2014, the city issued a notice of preparation (NOP) for a 685-residential-unit, mixed-use development with ground floor commercial, retail, and restaurant space.

The current approved project is a seven-story, mixed-use development with up to 725 residential units and over 51,000 square feet of commercial uses, totaling up to 618,580 square feet of floor area on a 4.92-acre vacant site. Residential uses are located within 5 five-story residential towers atop a two-story podium used for parking and commercial space.

**Revisions, application completion and draft EIR**

In 2015 Atlas purchased the site through its affiliate, Chinatown Station Owner LLC, and revised the proposed development to a six-building, 770-multifamily-unit, mixed-use development with 51,290 square feet of commercial and retail space. Atlas sought (1) general plan amendments (GPA) to deviate from Footnote 12 of the Central City North Community Plan and to change the project site's land use designation from "Hybrid Industrial" to "Regional Center Commercial," (2) a zone change for the project site, (3) a height district change to increase the maximum floor area ratio from 1:5:1 to 3:1 and (4) a site plan review.

On May 13, 2016, Atlas submitted its application for the vesting tentative tract map (VTTM) to subdivide the project site. Thereafter Atlas was not advised by the city that its application was incomplete. Therefore, the application was deemed complete 30 days later, on June 13, 2016, by operation of law. (Gov. Code, § 65943.)

On June 7, 2016, the city published a new NOP and notice of a June 22, 2016 public scoping meeting. The new NOP described the 770-unit project, including the requested GPA, zone and height district changes, and a site plan review. The NOP also added a master conditional use permit (MCUP) and a specific plan amendment (SPA) to reflect the project site's exemption from the Cornfields Arroyo Seco Specific Plan (CASP) provisions and to correct the community plan land use map.[3]

The city circulated a draft EIR (DEIR) for public review beginning March 15, 2018.

**Revisions to the project and final EIR**

In response to stakeholder concerns and at the city's request, Atlas redesigned the 770-unit project to create the project that the city ultimately approved, reducing it to five buildings with no more than 725 residential units and other minor modifications. The modifications were revealed and analyzed in the final EIR, which was released on August 31, 2018.

The final EIR also acknowledged that the applicant withdrew the request for the GPA to deviate from Footnote 12 of

---

[3]     The SPA request was eliminated in the final EIR because the project is not subject to the CASP provisions under an express exemption in the CASP. Therefore no SPA was required.

the Central City North Community Plan.  The city had determined after release of the DEIR, that Footnote 12 had been proposed but never adopted, and as a result Footnote 12 had never applied to either the site or the project.

**Certification of the EIR and approvals of the project**

On September 26, 2018, the city's deputy advisory agency considered the requested project VTTM and on November 6, 2018, issued its letter of determination setting forth its decisions to (1) certify the EIR, (2) adopt related environmental findings and a mitigation monitoring program and (3) approve the VTTM.  Various unrelated appeals were filed.  CCED did not appeal.

On December 13, 2018, the city planning commission (CPC) approved the MCUP and site plan review and recommended that the city approve the GPA, zone change, and height district change.  The parties in the unrelated appeals further appealed to the city council.

On January 18, 2019, the CPC denied the unrelated appeals.  It also recommended that the city council approve the GPA, zone change, and height district change.  The parties appealed the CPC's denial of their appeals and the VTTM, MCUP, site plan review and certification of the EIR to the city council.

On March 19, 2019, the city council's Planning and Land Use Management (PLUM) committee heard the appeals.  It also considered the requested GPA and zone and height district changes, and Atlas's request for clarification of various corrections to the project's conditions of approval, including the removal of the affordable housing condition.

Following the hearing the PLUM committee recommended that the city council approve a modified version of the CPC's

recommendation. Specifically the PLUM committee recommended that the city council (1) uphold certification of the EIR and adopt the findings of the PLUM committee as the findings of the city council; (2) approve the GPA resolution; (3) present and adopt a new ordinance dated March 20, 2019, for the zone and height district changes subject to conditions of approval modified by the PLUM committee; and (4) deny the CPC appeals and sustain approval of the VTTM, MCUP and site plan review subject to conditions of approval modified by the PLUM committee. When considering the CPC's recommendation on the zone change, the PLUM committee adopted modified conditions of approval that removed the affordable housing requirement.

On March 22, 2019, the city council adopted the PLUM committee's report in full and approved the project.

## PROCEDURAL HISTORY

CCED filed its verified petition in the trial court on May 8, 2019. The city and Atlas filed their answers on September 13, 2019.

On January 3, 2020, CCED filed its memorandum of points and authorities in support of its petition. On February 10, 2020, the city and Atlas each filed opposition briefs. CCED filed its reply on February 25, 2020.

A court trial was held on March 11, 2020. On April 29, 2020, the trial court issued a written order denying CCED's petition in full. The trial court resolved CCED's challenge under Measure JJJ by analyzing relevant Government Code sections as

7

applied to undisputed facts.[4]   Based on its analysis the trial court concluded that the city properly determined that Measure JJJ did not apply to the project.

Among many other issues the trial court also addressed CCED's claim that the EIR's conclusion that the soil contamination on the site would not result in significant soil contamination-related impacts was not supported by substantial evidence.  After analyzing the evidence the trial court concluded that CCED did not meet its burden of demonstrating that insufficient evidence supported the city's finding of a less than significant hazard from soil contamination.

The trial court also addressed CCED's claims regarding recirculation of the EIR.  Specifically the CCED argued that recirculation was required due to (1) the city's post-DEIR disclosure of the methane mitigation plan and (2) the city's post-DEIR removal of Footnote 12's application to the project.

As to the methane mitigation plan, the court found that the DEIR had disclosed the existence of methane at the site.  The DEIR had also disclosed that LAMC section 91.7103, the Los Angeles Methane Seepage Regulations (Methane Code), would apply to the project and would be incorporated into the project's design.  The court found that the additional information regarding methane mitigation in the final EIR "merely amplifies the information provided by the DEIR," providing more specifics related to the regulatory compliance identified in the DEIR.

_____

[4]    The trial court referenced Government Code sections 65943, 66418.1, 66474.2, and 66498.1.

Thus, the trial court concluded the city was not required to recirculate the DEIR under the CEQA guidelines.

As to the removal of Footnote 12, the trial court found that, because CCED made no argument as to any environmental impact resulting from this change, CEQA does not require recirculation on this issue. Instead the court found that the change was only a clarification of the legal requirements applicable to the project.

Judgment denying CCED's petition was entered on June 16, 2020.

CCED filed a notice of appeal from the judgment on August 10, 2020.

## DISCUSSION

### I. Applicable law and standards of review

"The standard of review in a CEQA case . . . is abuse of discretion." (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 512.) An agency may abuse its discretion under CEQA by either "failing to proceed in the manner CEQA provides or by reaching factual conclusions unsupported by substantial evidence." (*Sierra Club*, at p. 512.) We "determine de novo whether the agency has employed the correct procedures," but "accord greater deference to the agency's substantive factual conclusions." (*Ibid.*) Our review of the administrative record in a CEQA case is the same as the trial court's—we review "the agency's action, not the trial court's decision." (*Vineyard Area Citizens for Responsible Growth, Inc. v. City of Rancho Cordova* (2007) 40 Cal.4th 412, 427 (*Vineyard*).) Thus we independently determine whether the administrative record demonstrates legal

9

error or contains substantial evidence to support the agency's factual determinations. (*Ibid.*)

At issue on appeal is whether the city was required to apply the requirements of Measure JJJ to the project. In resolving this issue, we must consider whether the Subdivision Map Act (Gov. Code, § 66410 et seq.) barred application of Measure JJJ to the project. Our review of the statutory scheme and its application to undisputed facts is de novo. (*Tarbet v. East Bay Municipal Utility Dist.* (2015) 236 Cal.App.4th 348, 354.)

In reviewing the agency's approval of an EIR, we must determine whether the approval is "'supported by substantial evidence in the record.'" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392-393.) Substantial evidence is defined as "'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.'" (*Id.* at p. 393.) Courts are "not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information[al] document."(*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391.) We review the administrative agency's findings to determine whether they are supported by substantial evidence, then determine whether those findings support the administrative order or decision. (*Antelope Valley Press v. Poizner* (2008) 162 Cal.App.4th 839, 851.) Under the substantial evidence standard of review, we must resolve reasonable doubts in favor of the administrative finding and decision. (*Laurel*

10

*Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1135 (*Laurel Heights*).)[5]

When an EIR is challenged as inadequate we presume the agency's decision to certify the EIR is correct. The party challenging the EIR bears the burden of establishing otherwise. (*Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523, 530.)

## II. Applicability of Measure JJJ

### A. *Measure JJJ*

On November 8, 2016, the voters in the city approved Measure JJJ pursuant to a special municipal election. The city voters were asked:

> "Shall an ordinance: 1) requiring that certain residential development projects provide for affordable housing and comply with prevailing wage, local hiring and other labor standards; 2) requiring the city to assess the impacts of community plan changes on affordable housing and local jobs; 3) creating an affordable housing incentive program for developments near major transit stops; and 4) making other changes; be adopted?"

On December 13, 2016, the city council adopted the city clerk's certification of the election results. Pursuant to Elections Code section 9217, the approved measure went into effect 10 days after certification of the election results.

Also on December 13, 2016, the city council adopted ordinance No. 184745, which revised and added to certain

---

[5] "There is no practical difference between the standards of review applied under traditional or administrative mandamus." (*Friends of the Old Trees v. Department of Forestry & Fire Protection* (1997) 52 Cal.App.4th 1383, 1389.)

11

provisions of the LAMC and Los Angeles Administrative Code (LAAC) as approved by city voters. LAMC sections 11.5.6, 11.5.8, 11.5.11, 12.22 and LAAC section 5.522 contain the amendments approved through Measure JJJ.

The LAMC changes permitted the city to approve "a discretionary [GPA] or any zone change or height-district change that results in increased allowable residential floor area, density or height, or allows a residential use where previously not allowed" for a residential multiunit rental project where the project meets certain "on-site affordability provisions" and compliance with enumerated job standards. (LAMC, § 11.5.11, subd. (a).)

Specifically if the "[GPA], zone change or height district change allows a residential use where not previously allowed, then the Project shall provide no less than 5 [percent] of the total units at rents affordable to Extremely Low Income households, and either 11 [percent] of the total units at rents affordable to Very Low Income households or 20 [percent] of the total units at rents affordable to Lower Income households . . . ." (LAMC, § 11.5.11, subd. (a)1.(iii).)

Measure JJJ went into effect on December 23, 2016.

## B. *Proceedings below and CCED's argument on appeal*

CCED argues that the project was approved in violation of Measure JJJ. This argument was also made in the trial court. Specifically CCED argued that the city erred in granting land entitlements—"a [GPA] changing the Project site's General Plan designation from Hybrid Industrial to Regional Center Commercial, a zone change, a height district change, and an increase in floor area ratio—without requiring compliance with

12

Measure JJJ." CCED argued that Measure JJJ applied to the project because at the time the city approved these entitlements, the voters had approved the measure.

The city responded that Measure JJJ was not applicable to the project because the project was filed and deemed complete prior to the adoption of Measure JJJ. Atlas submitted its VTTM on May 13, 2016. On June 13, 2016, the VTTM application was deemed complete by operation of law. Measure JJJ did not go into effect until December 2016. After analyzing the relevant Government Code provisions the trial court determined that upon conditional approval of its VTTM application, Atlas had a vested right to develop the property in substantial compliance with the "pre-Measure JJJ ordinances, policies, and standards." The trial court rejected appellant's argument that the city was required to impose Measure JJJ conditions on the project "given [Atlas's VTTM] application was deemed complete six months prior to Measure JJJ's effective date."

CCED argues that the trial court erred in construing the city's approval of the VTTM to grant Atlas a vested right to proceed with the project given that the VTTM application was conditioned upon the city council ultimately legislatively approving the project's GPA and zoning and height district changes. CCED argues that the project was inconsistent with the city's general plan as well as permitted zoning and height district restrictions and as a result was contingent upon the city legislatively modifying the land use restrictions that applied to the project site. CCED argues that the trial court erred in finding that the vesting provisions of the Subdivision Map Act, Government Code section 66474.2, exempted the project's legislative approvals from Measure JJJ.

13

**C.   *Applicable Government Code sections***

The Subdivision Map Act regulates and controls the division of units of land.  (Gov. Code, §§ 66411, 66424.)

The relevant Government Code provisions include the following:

Government Code section 65943, subdivision (a), which states, in relevant part:

> "Not later than 30 calendar days after any public agency has received an application for a development project, the agency shall determine in writing whether the application is complete and shall immediately transmit the determination to the applicant for the development project.  If the application is determined to be incomplete, the lead agency shall provide the applicant with an exhaustive list of items that were not complete.  If the written determination is not made within 30 days after receipt of the application, and the application includes a statement that it is an application for a development permit, the application shall be deemed complete for purposes of this chapter."

Government Code section 66418.1 provides:

> "'Development' means the uses to which the land which is the subject of a map shall be put, the buildings to be constructed on it, and all alterations of the land and construction incident thereto."

Government Code section 66474.2, subdivision (a) provides, in relevant part:

> "Except as otherwise provided in subdivision (b) or (c), in determining whether to approve or disapprove an application for a tentative map, the local agency shall apply only those ordinances, policies, and standards in effect at the date the local

14

agency has determined that the application is complete pursuant to Section 65943 of the Government Code."

Government Code section 66498.1 provides, in relevant part:

> "(b)  When a local agency approves or conditionally approves a vesting tentative map, that approval shall confer a vested right to proceed with development in substantial compliance with the ordinances, policies, and standards described in Section 66474.2. . . .

> "(c)  Notwithstanding subdivision (b), the local agency may condition or deny a permit, approval, extension, or entitlement if it determines any of the following:

> "(1) A failure to do so would place the residents of the subdivision or the immediate community, or both, in a condition dangerous to their health or safety, or both."

## D.    *Analysis*

CCED admits that Measure JJJ became effective in December 2016, approximately six months after the project's VTTM was deemed complete by operation of law.  (Gov. Code, § 65943, subd. (a).)

The vesting provisions of the Subdivision Map Act, quoted above, limit a public agency's ability to apply ordinances, policies and standards to proposed development projects.  CCED does not dispute that, as set forth in the above statutes, a public agency may only apply those ordinances, policies and standards that are in effect when the agency deems a filed application for a VTTM to be complete.  (Gov. Code, §§ 65943, 66474.2, 66498.1.) "[Government Code] [s]ection 66498.1 et seq. were intended to

15

create a vested right affording greater protection and arising earlier in the development process than the right available under the common law doctrine." (*Kaufman & Broad Central Valley, Inc. v. City of Modesto* (1994) 25 Cal.App.4th 1577, 1588 (*Kaufman*).) The purpose of this section is to "'offer[] developers a degree of assurance, not previously available, against changes in regulations.'" (*Ibid.*) "It effectively freezes in place the ordinances, policies, and standards in effect at the time the vesting tentative map application is determined to be complete." (*Ibid.*; see *Bright Development v. City of Tracy* (1993) 20 Cal.App.4th 783, 793 (*Bright*) [noting that in enacting the vesting tentative map statutes, the Legislature intended that "'[t]he private sector should be able to rely upon an approved vesting tentative map prior to expending resources and incurring liabilities without the risk of having the project frustrated by subsequent action by the approving local agency'"].)

CCED does not dispute the law stated above. However, it claims that the trial court erred in construing the city's approval of the project's VTTM to grant a vested right to proceed with the project in this case because the project was *conditioned* on the city council ultimately approving the project's GPA and zoning and height district changes. CCED cites no specific law or authority suggesting that the Subdivision Map Act's vesting provisions are inapplicable in cases where the applicant requests amendments or zone changes.[6]

---

[6] Indeed counsel for CCED conceded the absence of legal authority for this argument at oral argument of the matter.

16

In fact the Subdivision Map Act expressly permits an applicant to file a VTTM application while concurrently seeking "changes in applicable ordinances, policies or standards in connection with the same development project." (Gov. Code, § 66474.2, subd. (c).) The statute specifies that "any ordinances, policies or standards adopted pursuant to the applicant's request shall apply." (*Ibid.*) Nothing in the statutory language suggests that the general rule—that ordinances, policies or standards enacted after a VTTM application is deemed complete may not be retroactively imposed on a project—is any different when an applicant seeks changes such as GPA's or zoning changes. (See *Bright, supra*, 20 Cal.App.4th at p. 788 ["The most notable feature of a vesting tentative map is that on its approval or conditional approval, the right vests in the subdivider to proceed with development in 'substantial compliance with the ordinances, policies and standards' in effect on the date on which the subdivider's application was deemed complete."].)

CCED further argues that Measure JJJ was not a general plan, specific plan, zoning, or subdivision ordinance. Instead CCED argues it was a voter initiative that imposes substantive requirements on the city's process for legislatively amending the city's general plan or zoning changes. CCED attempts to distinguish *Kaufman, supra*, 25 Cal.App.4th 1577 and *Bright, supra,* 20 Cal.App.4th 783 on the ground that those cases involved generally applicable ordinances, while this case involves "conditions placed upon legislative changes to land use ordinances." CCED claims that Atlas did not have a vested right to approval of its requests and the city's voters were free to impose additional conditions such as Measure JJJ's affordability and labor standards as part of its approval of those conditions.

17

Again CCED's argument lacks any legal support. There is no suggestion in any of the statutes that a later-imposed restriction—regardless of what aspect of the process it applies to—may be imposed after the developer's VTTM is deemed complete. CCED is essentially asking for a change in the law that permits the relevant agencies to impose additional conditions after approval of the VTTM's if those conditions have to do with the developer's requested amendments to the general plan or zoning or height district changes. We are not inclined to carve out such an exception in the absence of precedent.

Further there is no reason to categorize Measure JJJ and the subsequent amendments to the LAMC as anything other than changes in standards that the Subdivision Map Act intended to cover. Contrary to CCED's argument Measure JJJ was proposed as an ordinance from its inception. Measure JJJ was described as "Initiative Ordinance JJJ." CCED admits that Measure JJJ was enacted through amendments to the LAMC, including LAMC section 11.5.11. Thus regardless of its origin once it, as a voter initiative, was enacted by the city in December 2016 through ordinance No. 184745, it became a generally applicable land use ordinance.

Under the governing provisions of the Government Code the relevant two-part question is: (1) whether the conditions imposed by Measure JJJ, as enacted through the LAMC, constituted an ordinance, policy or standard; and (2) whether it was in effect at the time that the VTTM application for the project was deemed complete. (*Kaufman, supra*, 25 Cal.App.4th at p. 1590 ["the critical point in the process for the purposes of the vesting tentative map statutes is the date on which the map application is complete"]; see *Bright, supra*, 20 Cal.App.4th at

18

p. 795 ["We consider whether the record establishes the City had an ordinance, policy, or standard in effect at the time plaintiff's vesting tentative map application was deemed complete."].) The two-part answer is: (1) yes, Measure JJJ and the subsequent amendments to the LAMC are properly categorized as an ordinance, policy or standard under the vesting tentative map statutes; and (2) no, it was not in effect at the time the VTTM application for the project was deemed complete.

In short, the city and the trial court properly concluded that Measure JJJ was inapplicable to the project.

## III. CEQA challenges

### A. *CEQA*

The purpose of CEQA is to inform decisionmakers and the public about the potential significant environmental effects of a project. (Cal. Code Regs., tit. 14, § 15002, subd. (a)(1).) To that end an EIR may be required "to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.) An EIR must "'include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project.' ([Pub. Resources Code,] § 21100, subd. (b)(1).)" (*Vineyard, supra*, 40 Cal.4th at p. 428.) The EIR has been described as an ""'environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return.""" (*Save Round Valley Alliance v. County of Inyo* (2007) 157 Cal.App.4th 1437, 1446.)

19

CCED challenges the project's EIR in several respects.  We discuss each issue separately below and conclude that for each issue the city did not commit a prejudicial abuse of discretion. (Pub. Resources Code, § 21168.5.)

**B.** *Substantial evidence supported the EIR's conclusion that soil contamination created a less than significant hazard impact*

The EIR concluded that the project would result in a less than significant impact—that it would not expose persons to substantial risk—from reasonably foreseeable conditions involving the release of hazardous materials in the environment. CCED contends that substantial evidence does not support this conclusion.

Specifically CCED contends that the groundwater and soil contamination could have significant impacts on outdoor workers and construction workers because the project departs from proposed uses initially assumed by a 2003 "No Further Action" determination letter (No Further Action letter) issued by the Los Angeles Regional Water Quality Control Board (LARWQCB). The No Further Action letter prohibited residential use of the ground floor.  It also noted that at that time the project included no underground structures, green areas, or unpaved areas. CCED claims that the present project presently departs from the proposed use of the land at the time of the 2003 determination, therefore the EIR could no longer rely on the 2003 No Further Action letter.  Because there was no recent sampling or investigation, CCED contends that the EIR's reliance on the No Further Action letter was insufficient.

20

### 1. *The evidence*

The city's hazards impact determination was based largely on section 4.5 of the EIR, captioned "Hazards and Hazardous Materials." The EIR's review of the history of the project site and the prior testing and remediation work was included in appendix E and spanned over 300 pages of technical documentation.

The project site was "developed as far back as 1905 when the property was part of a rail freight yard." Structures on the site included "two freight houses, multiple rail lines, a wood yard, a coal yard, oil warehouses, small businesses, and dwelling units." Prior to 1970 the site was owned by the Union Pacific Railroad. In 1970 it was acquired by the Los Angeles Metropolitan Transit Authority (MTA) to support an expansion of MTA train service to Pasadena. All on-site buildings were demolished in the 1980's.

The project site was subject to a number of hazardous materials investigations between 1989 and 2002, which were listed in section 4.5 of the EIR.[7] An environmental site

---

[7] The hazardous materials investigations included: Final Site Report Underground Storage Tank Removal, prepared by Canonie Environmental in 1989; Workplan for Los Angeles County Metropolitan Transportation Authority Phase II Environmental Site, prepared by Weston in 1995; Phase I Environmental Assessment for Parcel PA-018, Metro Pasadena Blue Line prepared by Weston in 1996; Workplan for Parcel PA-018 Further Investigation, prepared by Montgomery Watson in 1999; Report of Environmental Soil and Groundwater Assessment, prepared by LAW Gibb Group in 2000; Remedial Action Plan, prepared by England Geosystems in 2001; Updated

assessment was prepared in 1996, which stated that four underground storage tanks and approximately 30 cubic yards of impacted soil were removed from the project site in 1989. Ultimately, the MTA submitted a remedial action plan (RAP) that was submitted to, and approved by, the LARWQCB in 2001. The RAP was implemented, and all remaining contaminated soil was removed.  Following the implementation of the RAP, the LARWQCB issued the No Further Action letter in 2003.  The 2003 No Further Action letter indicated that "past contamination on the Project Site has been fully identified and remediated to targeted cleanup levels.  As a result, the Project Site itself is not included on the lists of hazardous materials sites compiled pursuant to Government Code Section 65962.5 and is not part of the Pacific Pipeline 2000 cleanup site."

However, the No Further Action letter stipulated a deed restriction prohibiting the development of ground-level residential uses on the project site.  The deed restriction was recorded on April 15, 2003.[8]

---

Remedial Action Plan, prepared by England Geosystems in 2001; Remedial Action Plan Implementation Summary and Site Closure Request, Parcel PA-018, prepared by England Geosystems in 2002; and Response to OEHHA Comments, Updated Remedial Action Plan Parcel PA-018, prepared by England Geosystems, 2002.

[8]     CCED asserts that the No Further Action letter "contains institutional controls of no underground structures, green areas, or unpaved areas."  In fact, the No Further Action letter does not mention these as "institutional controls."  Instead, the No Further Action letter merely describes the proposed project,

The EIR documented that since the issuance of the No Further Action letter no uses have occurred at the project site that would warrant reconsideration of the letter, and no commenter offered any contrary evidence.

Based on a review of the reports of the various hazards materials investigations on the site dating back to 1989 and the

stating: "The site is planned for development of a four-story building, with commercial, retail business on the lower level and housing on the other three floors. There are no planned underground structures, green areas, or unpaved areas at the Site." There is no suggestion in the No Further Action letter that underground structures, green areas or unpaved areas are restricted or disallowed. CCED has provided a link to an explanation of the term "institutional controls": <https://www.epa.gov/superfund/superfund-institutional-controls#:~:text=Institutional%20controls%20are%20non%2Dengineered.the%20integrity%20of%20the%20remedy> (as of Nov. 29, 2021), archived at <https://perma.cc/7Z2N-MKQC>. The link does not suggest that the above description of the project may be considered an "institutional control." Instead, institutional controls are "administrative and legal controls," which "limit[] land or resource use and guide human behavior." As an example, the Web site explains, "zoning restrictions prevent land uses— such as residential uses—that are not consistent with the level of cleanup." The only zoning restriction imposed on the project was the restriction against development of ground-level residential uses at the project site. CCED misrepresents the record by referring to the above description of the plan as imposing "institutional controls." We decline to view them as such when the LARWQCB could easily have included restrictions on underground parking and open spaces in its recorded deed restriction. Instead LARWQCB declined to impose such restrictions.

prior testing and remediation work at the project site that culminated in the No Further Action letter, the EIR concluded "the Project Site has been adequately investigated and all known soil contamination has been remediated (soil excavated, removed, and disposed of) to the required cleanup levels." The EIR explained, "The Project would have no ground-level residential uses; all residential uses would be built atop subterranean parking or the podium parking structure." The EIR further concluded that "[c]onstruction activities, including excavation of on-site soils and site preparation, would not involve unusual or acutely hazardous materials and would not create a hazard to the public through the release of hazardous materials related to soil contamination and related impacts would be less than significant."

In discussing the cumulative impact of the project, the EIR determined that because "the Project Site has been subject to the issuance of a regulatory clearance as a result of the remediation of any onsite subsurface contamination, the Project would not result in a cumulatively considerable contribution to any unidentified cumulatively significant impacts." The EIR concluded that "Project-level and cumulative impacts with respect to hazards and hazardous materials would be less than significant."

On September 26, 2018, Milena Zasadzien of the environmental analysis division of the Los Angeles Department of City Planning, e-mailed Jeanette Liu and David Young of the

California State Water Resources Control Board (water board)[9] stating, "The City of Los Angeles, Department of City Planning is currently reviewing a project proposal for a site located at 924 N. Spring Street. The [LARWQCB] previously issued a No Further Action letter on the site in 2003. Would you have any availability this week for a phone call to discuss the letter and site?" On October 2, 2018, Young responded, "we closed the referenced site back in 2003 with the only restrictions being that you must notify the [LARWQCB] if 1) additional contamination is encountered during future activities at the site; or 2) there is a change of the proposed land use. Our oversight with respect to this project is complete, unless you are providing notice regarding items 1 & 2 (above)." Zasadzien replied, "No additional contamination has been found, but the project has slightly changed. The original proposal was for a mixed use commercial and residential project. The current proposal is the same but also includes subterranean parking, but not deeper than the level of soil that was reviewed previously. Would the underground component require any additional water board review?" Young responded, "unless additional contamination is encountered during future activities at the site (such as during the excavation work for the subterranean parking structure), no further review is needed from the [LARWQCB]."

---

[9]     The water board is a branch of the California Environmental Protection Agency. (About the California Water Boards <https://www.waterboards.ca.gov/publications_forms/publications/factsheets/docs/boardoverview.pdf> at p. 3 [as of Nov. 29, 2021], archived at <https://perma.cc/85ES-PJDD>.)

The evidence described above constitutes substantial evidence supporting the city's less than significant hazards conclusion regarding soil contamination.

> **2.** *CCED has failed to show a significant departure from the proposed use of the land since the time of the 2003 No Further Action letter*

CCED claims that modifications to the final EIR have caused a departure from the proposed use of the land such that the No Further Action letter no longer supports the EIR's conclusion of less than significant hazards resulting from soil contamination. Specifically CCED contends that the project now contains subterranean parking and open space, which departs from the assumptions made in the No Further Action letter.

CCED relies on *Citizens for Responsible Equitable Environmental Development v. City of Chula Vista* (2011) 197 Cal.App.4th 327, 332, for the proposition that disturbing contaminated soil can be a physical change in the environment. CCED asserts that it is undisputed that the project site contains contamination that would be disturbed and that the project departs from the proposed uses assumed by the 2003 No Further Action letter. Therefore, CCED claims the EIR could no longer rely on the 2003 No Further Action letter. In addition CCED contends the DEIR did not contain any recent investigations or sampling. CCED claims that the city should have conducted additional investigations to determine the hazards with the new proposals of underground parking and open space.

CCED's argument is based on the language in the No Further Action letter stating:

> "Therefore, it was concluded by OEHHA [(Office of Environmental Health Hazard Assessment)] that the

26

Site will not pose any significant health threat to humans following the development of the property. OEHHA also noted that as long as the nature, extent, and severity of the contamination does not significantly depart from those identified at this Site, and the use of the land does not depart from the proposed use, the health risks associated with residual contamination left in soils at the Site will not exceed—and most likely will be less than—those estimated for the protection of human health."

CCED interprets this to mean that any proposed design change constitutes a departure from the proposed use. CCED presents no legal authority that design changes, such as the addition of underground parking and open space, constitute a departure from the proposed use of the property that was contemplated in 2003. As the city points out, both the 2003 project and the current project present the same proposed use— mixed-use developments with commercial, retail businesses on the ground floor and housing on the upper floors. Neither the No Further Action letter nor the recorded deed restriction prohibit underground parking or outdoor open space. The No Further Action letter did not suggest that design changes such as those challenged here would present obstacles or change the conclusion of the No Further Action letter that "the health risks associated with residual contamination left in soils at the Site will not exceed—and most likely will be less than—those estimated for the protection of human health."

Further, there is evidence in the record that the city provided written notice to the water board that the project had been revised to include underground parking. The city received written reassurance in response that "unless additional contamination is encountered during future activities at the site

27

(such as during the excavation work for the subterranean parking structure), no further review is needed from the [LARWQCB]." This written exchange provides further support for the city's position that any soil contamination presented a less than significant hazard and undermines CCED's position that the evidence of prior investigations and remediation of soil contamination were insufficient.[10]

### C. *CCED has failed to show that recirculation of the EIR was required*

CCED argues that the city was required to recirculate the EIR for two reasons: first, because the city revised the final EIR to include a methane mitigation plan to mitigate methane hazards from the project; and second, because the city revised the EIR to remove the project's Footnote 12 designation and the

---

[10] As the city points out in its respondents' brief, CCED did not directly address the evidence of written e-mails between the city and the water board concerning the revisions to the plan including subterranean parking. Instead CCED claims, "nothing in the record . . . indicates that either the City or the Applicant notified the [LARWQCB] in writing of the significant change in the project since 2003." "As with all substantial evidence challenges, an appellant challenging an EIR for insufficient evidence must lay out the evidence favorable to the other side and show why it is lacking." (*Defend the Bay v. City of Irvine* (2004) 119 Cal.App.4th 1261, 1266.) CCED's failure to present a fair and adequate statement of the evidence that CCED claims is insufficient may be """"deemed tantamount to a concession that the evidence supports the findings.""" (*Markley v. City Council* (1982) 131 Cal.App.3d 656, 673.) Despite this omission we have examined the evidence and found it sufficient to constitute substantial evidence to support the findings.

associated GPA, which would have addressed the city's inconsistency with Footnote 12.

For the reasons set forth below, we find that CCED has failed to show that recirculation was required for either reason.

**1.** *Recirculation requirement*

Public Resources Code section 21092.1 provides: "When significant new information is added to an environmental impact report after notice has been given pursuant to Section 21092 and consultation has occurred pursuant to Sections 21104 and 21153, but prior to certification, the public agency shall give notice again pursuant to Section 21092, and consult again pursuant to Sections 21104 and 21153 before certifying the environmental impact report."

Under this statute, "when a lead agency adds 'significant new information' to an EIR after completion of consultation with other agencies and the public [citations] but before certifying the EIR, the lead agency must pursue an additional round of consultation." (*Vineyard, supra*, 40 Cal.4th at p. 447.) New information is "significant" only if "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse environmental effect of the project or a feasible way to mitigate or avoid such an effect." (*Laurel Heights, supra*, 6 Cal.4th at p. 1129.)

"The [CEQA] Guidelines describe the types of 'significant new information' requiring recirculation of a draft EIR." (*Citizens for a Sustainable Treasure Island v. City and County of San Francisco* (2014) 227 Cal.App.4th 1036, 1063.) These include "disclosure of '[a] new significant environmental impact,' '[a] substantial increase in the severity of an environmental impact,' and the addition of a 'feasible project alternative or mitigation

29

measure considerably different from the others previously analyzed.'" (*Ibid*.)  Recirculation is also required where "[t]he draft EIR was so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded."  (Cal. Code Regs., tit. 14, § 15088.5, subd. (a)(4).)

Recirculation is not required "where the new information added to the EIR merely clarifies or amplifies or makes insignificant modifications in an adequate EIR."  (Cal. Code Regs., tit. 14, § 15088.5, subd. (b).)  However, the decision not to recirculate an EIR must be supported by substantial evidence. (*Laurel Heights, supra*, 6 Cal.4th at p. 1135.)

> **2.** *Substantial evidence supports the agency's decision that recirculation was not required due to inclusion of the methane mitigation plan*

CCED explains that the methane mitigation plan was developed in July 2017 to mitigate the methane hazards resulting from the project.  Although the DEIR was released in March 2018, the city did not include the methane mitigation plan in the DEIR.  It was only after commenters objected that the city added the methane mitigation plan to the final EIR, which was not recirculated for public comment.

CCED must show not only that the methane mitigation plan was new, but that it provided "*significant* new information" as defined under the law.  (Pub. Resources Code, § 21092.1, italics added.)  CCED argues that the methane mitigation plan constituted significant new information because none of this information was made available and disclosed to the public during the public review process.  More importantly, CCED argues, the DEIR did not adequately disclose, analyze, or mitigate the project's potentially significant methane-related

30

impacts. CCED argues that this omission rendered the DEIR "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Cal. Code Regs., tit. 14, § 15088.5, subd. (a)(4).)

The record shows that several public comments on the DEIR concerned its failure to describe in detail the project's methane mitigation system. The city provided comprehensive responses to these comments. The city explained that the DEIR acknowledged that the project site is located in a city-designated methane zone, which means that methane is a condition of the existing setting, not an impact of the project. As such the methane need not be mitigated by the project. Instead, this condition, which existed in the setting, must be addressed through regulatory compliance. The EIR explained that the "Los Angeles Methane Seepage Regulations or Methane Code (Methane Code) establishes requirements for buildings and paved areas located in methane zones and methane buffer zones." The city further explained that "[a]s noted in Section 4.5 of the Draft EIR, compliance with the Methane Code, as well as all other applicable federal, state, and local regulations, is required and would therefore be implemented as part of the Project."

The purpose of the EIR is to inform the public of the potential significant environmental effects of a project. (Cal. Code Regs., tit. 14, § 15002, subd. (a)(1).) Therefore, an EIR must "'include a detailed statement setting forth . . . [¶] . . . [a]ll significant effects on the environment of the proposed project.' ([Pub. Resources Code,] § 21100, subd. (b)(1).)" (*Vineyard, supra*, 40 Cal.4th at p. 428.) The methane mitigation program—which was developed as a result of existing conditions and in compliance with the Methane Code—does not qualify as an

31

environmental effect of the project. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 386 (*California Building*) ["CEQA generally does not require an analysis of how existing environmental conditions will impact a project's future users or residents"].) Therefore it was not required to be detailed in the EIR. It follows that the DEIR was not "so fundamentally and basically inadequate and conclusory in nature that meaningful public review and comment were precluded." (Cal. Code Regs., tit. 14, § 15088.5, subd. (a)(4).) An EIR cannot be declared inadequate based on information that was not required to be included. (*California Building, supra*, at p. 386.)

Further, "[a]n agency may rely on generally applicable regulations to conclude an environmental impact will not be significant and therefore does not require mitigation." (S*an Francisco Beautiful v. City and County of San Francisco* (2014) 226 Cal.App.4th 1012, 1033.) *San Francisco* involved the installation of metal utility boxes housing telecommunications equipment on San Francisco sidewalks. (*Id.* at p. 1017.) The utility boxes were subject to the requirements for excavation permits found in a city public works order, which was "generally applicable to excavation permits for surface-mounted facilities." (*Id.* at p. 1033.) The agency was entitled to rely on the generally applicable order in reaching its conclusion that the environmental impact would not be significant. (See *Tracy First v. City of Tracy* (2009) 177 Cal.App.4th 912, 934 ["the City did not fail to proceed in the manner required by law when it relied on the California Building Energy Efficiency Standards in determining that the project would not have a significant energy impact"].)

The cases cited by CCED are distinguishable. In *Mountain Lion Coalition v. Fish & Game Com.* (1989) 214 Cal.App.3d 1043, 1050, "the draft EID [(environmental impact document)] that was circulated to the public to inform them of the environmental consequences of the proposed 1988 mountain lion hunt was woefully inadequate." It did not meaningfully address the impact of the proposed hunt on the national parks or forests. Instead, the document only stated a conclusion that "'the proposed action will not significantly affect State and federal park land uses." (*Ibid.*) The wildfire analysis was similarly only one sentence long. (*Ibid.*) The environmental impact document did not explain "in even minimum detail how it arrived" at its conclusion. (*Ibid.*) Unlike the present matter, *Mountain Lion* did not address an environmental issue that was subject to generally applicable regulations.

In *Ukiah Citizens for Safety First v. City of Ukiah* (2016) 248 Cal.App.4th 256, the issue was whether a subsequent addendum addressing the energy impacts of a project cured the prior approval of an inadequate EIR. (*Id.* at pp. 265-266.) The city recognized the deficiencies in its EIR and adopted an addendum. (*Id.* at p. 265.) The *Ukiah* court concluded that "[b]ecause the EIR certified in this case was inadequate in its analysis of energy impacts of the project, recirculation and consideration of public comments concerning the energy analysis will be necessary before the EIR may be certified and the project approved." (*Id.* at pp. 266-267.) Here, unlike in *Ukiah*, the city does not concede any inadequacies in its DEIR related to the methane mitigation plan. Instead, the city takes the position that its compliance with the Methane Code negated its obligation to include the methane mitigation plan in the DEIR. The city's

33

position is supported in the law.  Therefore, the DEIR in this case was not inadequate.

Finally CCED cites *Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 131.  In *Save Our Peninsula,* the issue of riparian rights "arose late in the environmental review process" and suffered from a "lack of analysis."  (*Ibid.*)  "Neither the draft EIR nor the revised EIR had mentioned such a right."  (*Id.* at pp. 131-132.)  Here, in contrast, the DEIR acknowledged that the project site is located in a city-designated methane zone, which means that methane is a condition of the existing setting, not an impact of the project.  The EIR explained that the "Los Angeles Methane Seepage Regulations or Methane Code (Methane Code) establishes requirements for buildings and paved areas located in methane zones and methane buffer zones."  The city further explained that "[a]s noted in Section 4.5 of the Draft EIR, compliance with the Methane Code, as well as all other applicable federal, state, and local regulations, is required and would therefore be implemented as part of the Project."  Unlike *Save Our Peninsula*, the subject of methane mitigation was raised and adequately addressed through reference to the project's compliance with the Methane Code.

CCED argues that the new information regarding the methane mitigation plan was significant under CEQA guidelines because "CEQA calls upon an agency to evaluate existing conditions in order to assess whether a project could exacerbate hazards that are already present" and "'any potentially significant impacts of locating development in . . . areas susceptible to hazardous conditions . . . .'"  (*California Building, supra*, 62 Cal.4th at p. 388.)  CCED argues that the project

34

acknowledges the dangers methane can pose, and the adoption of the methane mitigation plan is an admission that mitigation is necessary to ensure that the project's hazards impacts from methane would be less than significant.

We disagree. The information contained in the final EIR "'"merely clarifie[d] or amplifie[d]"'" the adequate information already contained in the DEIR. (*Silverado Modjeska Recreation & Park Dist. v. County of Orange* (2011) 197 Cal.App.4th 282, 302 ["[R]ecirculation of an uncertified EIR under [Public Resources Code] section 21092.1, is 'not required where the new information added to the EIR "merely clarifies or amplifies [citations] or makes insignificant modifications in [citation] an adequate EIR."'"]; see *High Sierra Rural Alliance v. County of Plumas* (2018) 29 Cal.App.5th 102, 127 [addition of maps and additional building standards merely clarified DEIR's information]; *Clover Valley Foundation v. City of Rocklin* (2011) 197 Cal.App.4th 200, 223 [new information in final EIR added narrative detail about the cultural resources' characteristics where the DEIR already provided sufficient analysis regarding the cultural impacts].) The DEIR explained that the presence of methane is an existing condition of the project site, therefore the Methane Code applies. The DEIR explained that "[r]equirements for new construction within such zones include methane gas sampling and, depending on the detected concentrations of methane and gas pressure at the site, application of design remedies for reducing potential methane impacts." The DEIR noted that the particular mitigation system would be based on the "site Design Level" with more involved systems "required at the higher Site Design Levels." The DEIR concluded that upon compliance with the

35

applicable laws there was no substantial risk to people using the site.

The additional information in the final EIR merely clarified and amplified this information. In response to public requests the city provided details regarding the methane mitigation plan required by the Methane Code, as well as available testing results. Based on the testing results the project site was determined to be "Site Design Level II (on a scale from I to V, with Site Design Level V being the highest level), in accordance with the Minimum Methane Mitigation Requirements set forth in the Methane Code." The final EIR further explained, "Under a Site Design Level II, the Project Site's methane gas mitigation system must, at a minimum, consist of: a 2-inch permeable aggregate layer on the subgrade; a drainage collection system drained to a sump; an impermeable methane gas barrier membrane above the aggregate layer; trench plus; and sealed conduits. A detailed Methane Gas Mitigation Plan is provided in Appendix E of the Final EIR." The document concluded, "A passive Methane Mitigation System is required for compliance with the City's Methane Code, and with regulatory compliance, impacts related to methane would be less than significant."

This information, which merely provided further detail regarding the site's design level and the relevant Methane Code requirements, did not provide significant new information. (See *Laurel Heights, supra,* 6 Cal.4th at p. 1140 ["addition of the discussion of night-lighting glare is an insignificant modification to the EIR that does not disclose a new adverse environmental impact"].) CCED points to no evidence that compliance with the Methane Code would not ensure that the project would not exacerbate the hazards already present due to methane, or

36

otherwise adversely impact the existing conditions.  Under the circumstances, recirculation was not required.

**3.** *Recirculation was not required based on elimination of the GPA to deviate from Footnote 12*

CCED argues that the recirculation requirement was also triggered when the city revised the DEIR to remove the project site's Footnote 12 designation and the GPA, which would have addressed the project's inconsistency with Footnote 12.

The DEIR stated that Footnote 12 applied to the site and set forth the affordable housing requirements of Footnote 12.  In its permit application filed in 2015, Atlas sought a GPA for deviation from Footnote 12.  The developer argued that the GPA would allow for more retail space; employment positions; localized spending and activity; and more dwelling units for the city.

The final EIR deleted the GPA request seeking deviation from Footnote 12.  The EIR explained:

> "The original Project entitlement application included a request for a General Plan Amendment seeking relief from Footnote 12 of the Central City North Community Plan Land Use Map, relating to affordable housing.  After the publication of the Draft EIR, the City determined that Footnote 12 was never formally adopted by the City (see Council File 07-3868 for reference), and thus is not an effective regulation.  The City is in the process of correcting the Central City North Community Plan Land Use Map to reflect the inapplicability of Footnote 12."

As set forth above recirculation of an EIR is required only if "the EIR is changed in a way that deprives the public of a meaningful opportunity to comment upon a *substantial* adverse

environmental effect of the project or a feasible way to mitigate or avoid such an effect." (*Laurel Heights, supra*, 6 Cal.4th at p. 1129; see Cal. Code Regs., tit. 14, § 15088.5, subd. (a).) Here, the deletion of the GPA request for deviation from Footnote 12 does not relate to either a "substantial adverse environmental effect of the project or a feasible project alternative or mitigation measure that would clearly reduce such an effect." (*Laurel Heights, supra*, at p. 1120.) Instead, it relates to an affordable housing proposal that was never formally adopted by the city. Removing a request to deviate from an inapplicable legal requirement regarding affordable housing does not concern an environmental effect and therefore is not "'significant new information'" requiring recirculation under the applicable law. (*Id.* at p. 1129; see Cal. Code Regs., tit. 14, § 15088.5, subd. (a).)

## DISPOSITION

The judgment is affirmed. Respondents are awarded their costs of appeal.

_____
CHAVEZ, J.

We concur:


_____
ASHMANN-GERST, Acting P. J.


_____
HOFFSTADT, J.